UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ROY STANLEY, ET AL. | CIVIL ACTION |
| VERSUS | NO: 16-13753 |
| STARFLEET MARINE TRANSPORTATION, INC. ET AL. | SECTION: "J"(1) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Plaintiffs in this case are offshore platform operators, Roy Stanley and Mitchell Mouton, who were injured as passengers aboard the M/V MS. LINDA LEE while it was transporting them to shore on March 23, 2014. Plaintiffs sued the MS. LINDA LEE and its owner-operator, Starfleet Marine Transportation, Inc., alleging the Defendants' negligence caused their injuries.

The Court held a bench trial on August 13, 2018, and took the matter under advisement. Having considered all the evidence and counsels' arguments, the Court issues the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a). To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

## FINDINGS OF FACT

1. On March 23, 2014, Roy Stanley and Mitchell Mouton were passengers aboard the M/V MS. LINDA LEE for crew change from Fieldwood Energy's East Breaks 165A ("EB-165A") platform.

1

2. The MS. LINDA LEE is a 170 ft., DP-1 Fast Offshore Supply Crewboat that is owned and operated by Starfleet. Exhibit 6.

3. Jamie Brown was Captain of the MS. LINDA LEE and at all pertinent times was acting in the course and scope of his employment with Starfleet.

4. Capt. Brown carries a 100-ton master's license issued by the United States Coast Guard and has been operating offshore vessels for 25 years. He testified that he has made over a thousand crew trips without incident.

5. On Sunday, March 23, 2014, the MS. LINDA LEE left port in Cameron, Louisiana for crew change to several offshore platforms owned by Fieldwood Energy.

6. The intended roundtrip voyage for the MS. LINDA LEE was expected to be completed Sunday, March 23, 2014, within the north-central region of the Gulf of Mexico.

7. The MS. LINDA LEE received the daily weather forecast from the National Weather Service ("NWS") for the Gulf of Mexico at 0649 hours on March 23, 2014.

8. The weather report for the north-central part of the Gulf of Mexico advised of winds out of the south and southwest of 5-10 knots with 2-3 foot seas during the day, with the winds picking up out of the north and northeast at 10-15 knots but the seas remaining 2-4 feet late Sunday. The weather service also predicted scattered showers and isolated thunderstorms for Sunday night. The report forecasted a cold front would move onto the Gulf

on Monday, March 24, 2014, beginning with 15-20 knot winds out of the Northeast to East with 3-5 foot seas in the north-central gulf. The front was predicted to bring higher seas and stronger winds late on Tuesday, March 25, 2014. Exhibit 4.

9. The MS. LINDA LEE is equipped with VHF radio that provides additional weather alerts when the weather is severe.

10. Prior to taking over in the wheelhouse at 1200 hours, Capt. Jamie Brown reviewed the daily NWS weather report, which was still the same as the report sent at 0649 hours.

11. After transferring crew at other platforms, the vessel arrived at EB 165A at approximately 1800 hours, where it was to pick up a six-man crew, including Plaintiffs, Roy Stanley and Mitchell Mouton.

12. The EB 165A platform is located approximately 125 miles south-southwest of Cameron, on the Outer Continental Shelf.

13. On March 23, 2014, Mr. Stanley (A Operator) and Mr. Mouton (Lead Operator) were employed by Wood Group PSN, Inc. Mr. Stanley has worked offshore for seven years and has limited experience as a passenger on offshore crewboats in open water; he testified he has generally traveled by helicopter or has only traveled short distances to platforms close to shore. Mr. Mouton has worked offshore for more than twenty years and has significant experience as a passenger on offshore crewboats.

14. On March 23, 2014, Roy Stanley and Mitchell Mouton had worked a shift

from 0600 to 1800 hours on the platform before boarding the MS. LINDA LEE via personnel basket from the platform along with several other members of the crew from the EB 165A platform. Mr. Mouton testified that the weather was choppy upon boarding, but not unusually so.

15. The MS. LINDA LEE left EB-165A at approximately 1830 hours to begin its voyage to the dock in Cameron, Louisiana.

16. By this time, the NWS's weather forecast had not been updated, though the winds had started picking up, evidencing that the front was arriving earlier than forecasted by the NWS.

17. After the passengers boarded the vessel, Mr. Mouton went into the wheelhouse to speak with Capt. Brown and they discussed the cold front and the worsening weather. Capt. Brown could not recall the specifics of this conversation, other than it concerned the weather. Mr. Mouton testified that he spoke with Capt. Brown to determine what plan the captain had for reaching port safely. According to Mr. Mouton, Capt. Brown replied they would "run in" to avoid the deteriorating weather. By this, Mr. Mouton testified he assumed that Capt. Brown meant that he would take a more direct route to the coast in order to avoid the worsening weather. Mr. Mouton equated the water close to the shore with "shallow water." He testified that he expected that upon reaching "shallow water," Capt. Brown would then steer the MS. LINDA LEE east, towards Cameron, Louisiana, their expected port.

18. However, the captain did not steer the MS. LINDA LEE to the closest shore, the Texas coast. Rather, he maintained a steady course for Cameron. Capt. Brown testified that upon leaving EB 165A, he was operating the vessel at 17 knots, about two-thirds speed for the MS. LINDA LEE. He further testified that although the vessel's autopilot was set for a course towards Cameron, he would override the autopilot when necessary to ensure the vessel caught the seas "on the cheek," or on his starboard bow, which allowed the vessel to roll over the swells rather than hit them head on.

19. Capt. Brown further testified that he never would have considered a route to the Texas coast. He testified that the MS. LINDA LEE rode swells much more gently by approaching them at a ten degree angle rather than taking them directly. He stated that if he had headed for the Texas coast, to his northwest—he would have been heading directly into the squall. This would have been "worse in every aspect" according to Capt. Brown. In addition to forcing the MS. LINDA LEE to take swells head-on, it would have lengthened the voyage. The MS. LINDA LEE would have to travel against swells towards Texas (slowing its speed further) and then make a right turn to head towards Cameron along the coast to cover the extra distance. During this longer journey, the storm would have worsened, increasing the chances of an accident at sea.

20. The Court finds Capt. Brown's testimony concerning the weather

conditions and the consequences of an alternate route towards the Texas coast to be very credible. Given the difficulties and dangers of diverting to a longer route, as well as the ambiguity of Mr. Mouton's testimony, the Court finds that Capt. Brown never told Mr. Mouton that he was steering the MS. LINDA LEE in any general direction other than towards Cameron.

21. Mr. Stanley testified that approximately one hour into the voyage, he became ill and went out to the back deck of the vessel for fresh air. He testified that at this point the weather was continuing to deteriorate and that the waves were strong enough to come over the gunwales of the boat and wet everything on the deck. Mr. Stanley was sick for some time before he returned to the cabin to take Dramamine and lie down. The MS. LINDA LEE's passenger cabin is comprised of rows of reclining seats; there are no arm rests separating seats or seat belts, so Mr. Stanley lay down across several seats. Mr. Stanley then fell asleep. He testified that before he fell asleep the boat was never slowed and Capt. Brown never told him not to lie down and neither did anyone else.

22. Mr. Mouton spent the first approximate 2 hours and 45 minutes of the return voyage on the back deck of the vessel without incident or complaint about the weather. In fact, he testified that though the seas were rough, the weather was nothing out of the ordinary. Furthermore, he testified that given the weather conditions he had no concerns regarding the speed of the boat. However, he, like Mr. Stanley, testified that he never felt the vessel

slow down before the incident. Mr. Mouton then went into the cabin to sleep in one of the chairs.

23. Capt. Brown's testimony regarding the voyage prior to the incident contradicts Mr. Stanley and Mr. Mouton's testimony in some regards. Most importantly, Capt. Brown testified that he did slow the MS. LINDA LEE prior to the incident. He testified that he began the trip traveling at a speed of approximately 17 knots. However, he slowed the vessel speed down to 10-12 knots over an hour before the incident, out of concern for a sick passenger—Mr. Stanley—and because the weather was worsening and it was becoming very dark and it was difficult to see. Capt. Brown testified he could approximate the time he slowed the vessel, because the incident occurred two "engine room checks later," and his engineer always checks the engine room every thirty minutes. He also testified that he came downstairs prior to the incident to tell the passengers to sit up straight in their chairs.

24. The Court finds Capt. Brown's testimony that he slowed the MS. LINDA LEE prior to the incident to be credible. Neither Mr. Stanley nor Mr. Mouton were able to see into the wheelhouse and view the throttle. The sheer darkness itself was a reason that Capt. Brown decided to reduce speed and it would therefore be very difficult for the Plaintiffs to use any visual reference points to gauge the speed of the vessel at the time it was slowed. Moreover, Mr. Mouton's assertion that he would have heard the engines slow from the back of the boat is unconvincing. He admits that he was unconcerned with the vessel's speed and so there was no

reason for Mr. Mouton to be alert to any changes in velocity. Given Capt. Brown's testimony, it is likely then that Mr. Mouton and Mr. Stanley simply did not notice that the vessel's speed was reduced by a mere five to seven knots.

25. The Court also finds Capt. Brown's assertion that he asked the passengers to sit up in their chairs to be credible. Only Mr. Stanley would have heard this admonition—as Mr. Mouton was not in the cabin at this time—and Mr. Stanley was doubtlessly distracted by his severe nausea and general fatigue.

26. Both Mr. Stanley and Mr. Mouton testified that they were able to fall asleep for a short time once they lay down in the cabin. At approximately 2130 hours, or about fifteen minutes after the Plaintiffs fell asleep, the Plaintiffs were ejected from their seats as a result of the vessel encountering what Capt. Brown described as a "rogue set of waves." By a "rogue set" Capt. Brown explained he meant a wave "without a back" followed by a trough and then another wave. By using the word "rogue," Capt. Brown intended to indicate this set of waves was different from the other sea swells encountered by the MS. LINDA LEE before and afterwards. Capt. Brown testified that the first wave was about a foot taller than the surrounding seas, but more importantly it lacked the sloping backside of the other swells. Rather, he explained that where a swell would normally gently slope, this swell dropped off vertically into the trough soon after its crest. It was Capt. Brown's testimony that the vessel was not thrown into the air by a sudden steep wave, but rather the vessel dropped suddenly into the trough as the

MS. LINDA LEE crested over the first wave of the rogue set.

27. Mr. Mouton testified that the force of a wave awoke him as he and Mr. Stanley were tossed four to five feet into the air, above their seats in the passenger cabin. Then another wave immediately followed and tossed them into the air again. Each time Mr. Mouton landed hard on his seat, striking his shoulder and his back.

28. Mr. Stanley's testimony comports to Mr. Mouton's. He stated that he was also awoken upon being tossed into the air and that he fell back down to the floor before being thrown into the air again by a second wave.

29. Again, the Court finds Capt. Brown's explanation of the events to be credible. To Mr. Stanley and Mr. Mouton, the MS. LINDA LEE's sudden drop off from the crest of the first wave would have felt to them as if the vessel had been bucked into the air. In actuality, it appears that the vessel dropped off the crest of a wave and Mr. Stanley and Mr. Mouton were held in the air momentarily by inertia before falling down to where the vessel rested in the wave trough. The event repeated as the MS. LINDA LEE encountered the second wave of the "set."

30. At this point, the Plaintiffs' testimony substantially converges with Capt. Brown's. Immediately after encountering the two inciting waves, Capt. Brown put the vessel into neutral and went into the passenger cabin to check on the passengers. Mr. Mouton and another Wood Group Operator, Efrain Irias, complained to Capt. Brown that they were in pain and/or

9

discomfort as a result of the incident. Mr. Stanley made no complaints whatsoever.

31. Capt. Brown took Mr. Irias and Mr. Mouton down to the bottom deck to prepare incident reports and to ride out the remainder of the voyage. In the incident report, both Mr. Mouton and Capt. Brown note that the vessel had been hit by a set of "rogue" waves. Thereafter, Capt. Brown again maintained his speed at 10 knots and there were no further incidents during the rest of the voyage.

32. Due to the swells building and the vessel only making approximately 10 knots, the vessel ultimately arrived at 0530 on March 24, 2014.

## **CONCLUSIONS OF LAW**

33. This is a case of admiralty and maritime jurisdiction, brought under the provisions of 28 U.S.C. § 1333, and is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. *See generally Exec. Jet Aviation, Inc. v. City of Cleveland, Ohio*, 409 U.S. 249 (1972).

34. In a maritime tort case, the plaintiff has the burden of proving by a preponderance of the evidence that (1) the defendant owed a duty to the plaintiff, (2) there was a breach of that duty, (3) the plaintiff suffered an injury, and (4) there is a causal connection between the defendant's conduct and the plaintiff's injury. *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 211 (5th Cir. 2010), *In re Katrina Canal Breaches*

*Consol. Litig.*, No. 05-5724, 2011 WL 1792542, at *19 (E.D. La. Jan. 20, 2011) (citations omitted).

35. "The existence and scope of a duty under the general maritime law turns primarily on the foreseeability of the harm suffered by the complaining party." *Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987). "Vessel owners owe their passengers a duty of reasonable care under the circumstances." *Deperrodil v. Bozovic Marine, Inc.*, 842 F.3d 352, 357 (5th Cir. 2016) (citing *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959)). This includes a "duty to warn passengers of reasonably anticipated dangers—though not openly obvious ones." *Counts v. Lafayette Crewboats, Inc.*, 622 F. Supp. 299, 301 (W.D. La. 1983).

36. Generally, there is no presumption of negligence merely because an accident occurred. *Sweeney v. Erving*, 228 U.S. 233, 238 (1913). Moreover, "a plaintiff does not prove a *prima facie* case where the accident, with equal reasonableness, might have been accounted for on a theory that did not entail negligence on defendant's part." *Union Carbide Corp. v. M/V Irene Chotin*, 1974 A.M.C. 2231, 2239 (E.D. La. 1974).

37. Causation has two sub-elements: "(a) cause in fact and (b) proximate or legal cause." *In re Mid South Towing Co.*, 418 F.3d 526, 532 (5th Cir. 2005). To establish cause in fact, the plaintiff must show that the incident would not have occurred but for the defendant's negligence. *In re Katrina Canal*

*Breaches Consol. Litig.*, 2011 WL 1792542, at *20. "[W]here there are concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about the accident." *Id.* (quoting *Hennigan v. Cooper/T. Smith Stevedoring Co., Inc.*, 837 So. 2d 96, 102) (La. App. 4 Cir. 2002)). If the plaintiff's injury would have occurred in the absence of the defendant's act or inaction then the defendant's conduct is not a substantial factor. *Id.* (citing Thomas J. Schoenbaum, Admiralty and Maritime Law, § 5-3 (4th ed. 2004)). "Proximate cause involves a policy determination as to whether the plaintiff's injuries were a reasonably foreseeable result of the defendant's alleged negligent conduct." *Consolidated Aluminum Corp.*, 833 F.2d at 68.

38. Plaintiffs argue that Defendants breached their duty of care because Capt. Brown operated the MS. LINDA LEE at an unsafe speed, because he failed to adequately warn the Plaintiffs to sit in their seats properly, and because he failed to take a direct route to the coast in order to avoid the storm. The Court finds that Plaintiffs have failed to prove any of their theories.

39. First, as indicated above, the Court finds that Capt. Brown did reduce the speed of the MS. LINDA LEE down to 10-12 knots prior to the Plaintiffs becoming injured. Capt. Brown testified if he had reduced his speed much further—to around 7 knots—he would have lost control of the vessel in the swells. Plaintiffs do not disagree that 10-12 knots was an appropriate speed for the vessel in the prevailing conditions. Moreover, even if the Court had

found that Capt. Brown had maintained a speed of 17 knots, Plaintiffs have not put forth any evidence of what effect that speed would have had on the MS. LINDA LEE when it encountered waves with steep vertical backsides. A higher speed may have worsened the jolt as the vessel impacted the trough or it may not have had any effect at all. Plaintiffs have failed to establish that Capt. Brown breached his duty with regard to the speed of the vessel, or even that but for the adopted speed, Plaintiffs would not have been injured.

40. Likewise, the Court has already found that Capt. Brown did warn his passengers to sit in their seats after the weather deteriorated. And again, Plaintiffs have failed to prove causation; Plaintiffs have not put forth any evidence demonstrating that an admonition to sit upright would have mitigated Plaintiffs' injuries when the vessel encountered the backless waves. There are no seatbelts on the vessel* and Plaintiffs had the burden to show that that but for the inadequate warning they would have been uninjured. They did not meet that burden.

41. Finally, the Court rejects Plaintiffs' theory that Capt. Brown violated his duty of care when he maintained his course for Cameron, Louisiana, rather than diverting for the Texas coast. First, it is not clear why such a diversion would have been foreseeably necessary. Mr. Mouton did testify that he wanted to know Capt. Brown's "plan" as it related to the weather but he

---

* Plaintiffs have never argued that the lack of seatbelts violated any standard of care.

also testified—as an experienced crewboat passenger—that the conditions were entirely normal. He stated it was not uncommon for him to ride in a crewboat of the MS. LINDA LEE's size in six to eight foot seas. Capt. Brown similarly testified, with the benefit of six years captaining the MS. LINDA LEE, that the vessel could capably handle seas of that height and beyond. Given the ordinary gulf weather conditions, there was no reason for Capt. Brown to divert from his expected course. Moreover, there is no evidence that a change of heading towards the Texas coast would have been more prudent. Plaintiffs put forth no evidence that the Texas coast did indeed offer nearby "shallow waters" or even that shallow waters would have been safer in the inclement weather. Capt. Brown testified that a northwest route would have put the MS. LINDA LEE on a headlong course with the squall and that it would have been more unsafe than the route to Cameron.

42. Thus, the Court finds that Plaintiffs have failed to demonstrate that Defendants breached any duty of reasonable care as a result of Capt. Brown's actions or inactions. As such, it is unnecessary for the Court to address Defendants' claim that the waves encountered were "rogue waves" that were unforeseeable 'Acts of God.'

## **CONCLUSION**

Based on the foregoing Findings of Fact and Conclusions of Law, the Defendants are not liable to Plaintiffs. Judgment will be entered accordingly.

New Orleans, Louisiana, this 24th day of August, 2018.

_____
Carl J. Barbier
United States District Judge